## FOSTER v. UNITED STATES.
### No. 6349.

District Court, D. Massachusetts.
Jan. 4, 1939.

John H. Sherburne and Walter White, both of Boston, Mass., for plaintiff.

John A. Canavan, U. S. Atty., and William J. Hession, Asst. U. S. Atty., both of Boston, Mass., for defendant.

BREWSTER, District Judge.

This action is brought by the beneficiary named in a policy of insurance issued by the United States on the life of Winthrop M. Foster, a World War Veteran, who disappeared December 28, 1926. The only question is whether a presumption of death, arising from the unexplained absence of more than seven years, may be invoked by the plaintiff as proof of the death of the insured. The facts are not in dispute.

The insured was born in 1890. He enlisted in the World War and served overseas. He married in 1920 and established a home in Winchester, Massachusetts, where he continued to reside until the time of his disappearance. He had been employed as a salesman for a lumber company, but had recently been told by his employer that the Company was about to liquidate and that after January 1, 1927 his services would not be needed.

In December, 1926, just before Christmas, the veteran with his wife and 4-year old boy went to Garden City, Long Island, to spend the Christmas holidays with Mrs. Foster's parents, Mr. and Mrs. John H. Mills. On the morning of December 28, 1926, he left for New York with the avowed intention of procuring tickets for the theatre. He told Mrs. Mills that he would return in time for dinner. He has never been seen since by any of his family or relatives, or by any of his friends or acquaintances so far as the evidence disclosed, although a most diligent and extensive search has been made. His disappearance was immediately reported to the local police and to the New York Police Department, and the usual means for discovering lost persons were set in motion. Advertisements were inserted in publications, which had wide circulation, issued by veterans' organizations. A radio appeal for his return was made. Every effort has been made by his family to locate him, and the government has also endeavored to ascertain his whereabouts by exhaustive inquiries in the Army, Navy, and Government hospitals. All of these efforts to reach him have been in vain.

Some information was obtained respecting his movements after he left Garden City. It was learned that on the night of December 28, someone who gave his name as A. B. Carney took passage at New York on the steamer Lexington, bound for Providence, R.I. He was given stateroom No. 11. On the morning of the 29th, when the Lexington arrived in Providence, it was found that the stateroom was empty and locked from the inside. Upon entering through a partly open window, there was found a hat and bill-fold which were identified as belonging to Foster. In the bill-fold was a Massachusetts automobile license on which the Winchester address had been crossed out and an address in "care of Mr. John H. Mills, 108 Salisbury Avenue, Garden City, New York," was substituted. On the back of the transportation ticket he had written Mr. Mills' name and address. There was no money found in the bill-fold. There was evidence that he had received, since November, some $500, but most of this had been paid out, so that it is fair to assume that he did not have much money on his person when he left Garden City.

Before the insured left the Mills home, on the last morning, his wife had given him a letter to mail. This letter was duly

received, showing that it had been post-marked at Providence December 29, 1926, at 8:30 P. M. There were no facilities on the Lexington for mailing letters, and none of the officers or crew interrogated recalled being asked to mail any letter.

So far as appears, the insured was in good health. No one had noticed, prior to his disappearance, anything unusual in his behavior or conduct, or anything suggesting the idea of suicide. His family relations were pleasant. He was highly regarded among his neighbors, friends, employer and business associates. He was known as a devoted husband and father. There is nothing in the case to explain suicide except possibly the loss of his position. This apparently did not weigh upon his mind, although he had kept the information from his wife. Nor is there anything in the case which offers any reason why he should entertain any thought of deserting his wife and child.

The mailing of the letter several hours after the steamer docked, while not conclusive, would tend to show that Foster was alive after the Lexington reached Providence, and the discoveries made in his stateroom would lend support to the inference that he purposely simulated suicide.

The foregoing are my findings of fact, required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

In Petition of Talbot, 250 Mass. 517, 519, 146 N.E. 1, 2, it is stated that "The rule in regard to the presumption of death was stated by Chief Justice Shaw in Loring v. Steineman, 1 Metc. 204, 211, in the following language: 'It is a well-settled rule of law, that upon a person's leaving his usual home and place of residence for temporary purposes of business or pleasure, and not being heard of, or known to be living, for the term of seven years, the presumption of life then ceases, and that of his death arises.. * * * But this presumption may be rebutted by counter evidence * * * or by a conflicting presumption.' "

In the case at bar, it must be conceded that Foster left for temporary purposes of pleasure, that he has not been heard of or known to be living for a term of seven years. The government contends, however, that the presumption is rebutted if the absence is explained, and that Foster's attempt to mislead his family into the belief that he had committed suicide while on the Lexington was an explanation sufficient to destroy the presumption, the theory advanced being that under such circumstances he would not be likely to communicate with his family or relatives.

In the case of Petition of Talbot, supra, cited by the defendant in support of its contention, it appeared that Talbot left home accompanied by a married woman other than his wife. It was there held that the court was warranted in finding that Talbot intended to abandon his family and start anew in some other place, justifying the inference that he would not be likely to let his family, or former associates, hear from him or know where he was. In that case the intention and the reason for the intention were both shown. In the case at bar, while it may be possible to infer an intention on the part of Foster to make his wife and her parents believe that he was dead, there is nothing to explain why he should thus, without any apparent reason, suddenly decide to abandon those who had been the objects of his affection.

I am of the opinion that Foster's absence has not been explained. It was, and still is, an unsolved mystery. Furthermore, the presumption arising from an unexplained absence is strengthened by evidence of a diligent and wide-spread but fruitless search made by his relatives and by the government extending over a period of nearly twelve years.

I rule, therefore, that the presumption of death has not been rebutted, and the plaintiff is entitled to the benefits of it in asserting her claim under the policy.

No question is here raised respecting the time of the death. If the presumption is indulged, parties agree that the presumption arose at the end of seven years after the veteran was last heard from, which would be either December 28 or December 29, 1926. It is not material which date is taken.

Judgment may be entered in favor of the plaintiff, the amount of the judgment to be agreed upon by the parties. In case of disagreement, the case may be set down for further hearing.